United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

SOMPHANE SIPASEUTH,
Plaintiff,
v.
MOISES BECERRA, et al.,
Defendants.

Case No. 26-cv-07942-BLF

**ORDER GRANTING PRELIMINARY INJUNCTION**

[Re: ECF No. 2]

Petitioner Somphane Sipaseuth filed a petition for writ of habeas corpus against Respondents San Francisco Field Office Director of Enforcement and Removal Operations Moises Becerra, Secretary of the Department of Homeland Security Markwayne Mullin, the U.S. Department of Homeland Security, Attorney General Pamela Bondi, and the Executive Office of Immigration Review on July 30, 2026. ECF No. 5 ("Pet."). Mr. Sipaseuth simultaneously filed his *ex parte* motion for a temporary restraining order ("TRO"). ECF No. 2; *see also* ECF No. 2-1 ("Mot."). The next day, Respondents filed a response to the motion. ECF No. 9. Later that day the Court issued a TRO enjoining Respondents from detaining Mr. Sipaseuth without notice and a pre-deprivation hearing before a neutral decisionmaker and ordering Respondent to show cause why a preliminary injunction should not issue. ECF No. 11 ("TRO Order"). Respondents subsequently filed a response to the order to show cause, *see* ECF No. 14 ("Opp."), and Mr. Sipaseuth filed a reply, *see* ECF No. 15 ("Reply"). The Court heard oral argument on August 13, 2026. ECF No. 17.

For the reasons set forth below, Mr. Sipaseuth's motion for a preliminary injunction is GRANTED.

## I. BACKGROUND

### A. Regulatory Background

This case concerns the re-detention of a noncitizen who is subject to a final order of removal. The detention and release of a noncitizen subject to a final order of removal is governed by 8 U.S.C. § 1231. This statute provides that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). "If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." *Id.* § 1231(a)(3).

The revocation of a noncitizen's release and return to custody is governed by 8 C.F.R. §§ 241.4(l) and 241.13(i). The government is permitted to revoke a noncitizen's release and return them to custody "if, on account of changed circumstances, the Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2). This same section requires that "[u]pon revocation, the alien will be [1] notified of the reasons for revocation of his or her release" and that "[2] [t]he Service will conduct an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.13(i)(3). Similarly, Section 241.4(l)(1) provides that "[u]pon revocation, the alien will be [1] notified of the reasons for revocation of his or her release or parole" and that "[2] [t]he alien will be afforded an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.4(l)(1). Section 241.13(i) also provides that the noncitizen "may submit any evidence or information that he or she believes shows there is no significant likelihood he or she [will] be removed in the reasonably foreseeable future, or that he or she has not violated the order of supervision." 8 C.F.R. § 241.13(i)(3).

### B. Factual Background

Mr. Sipaseuth is a citizen of Laos who was admitted to the United States as a refugee in 1983 when he was ten years old. Pet. ¶¶ 1–2. He adjusted his status to that of a lawful permanent

United States District Court
Northern District of California

resident in 1986. *Id.* ¶ 2. Between 1992 and 1996, Mr. Sipaseuth received three criminal convictions for auto burglary, battery with serious bodily injury, and battery. *Id.* ¶ 3. After completing a four-year prison term, Mr. Sipaseuth was issued a Notice to Appear in immigration court and was transferred to Immigration and Customs Enforcement ("ICE") custody. *Id.* ¶ 4. He was charged with deportability under Immigration and Nationality Act section 237(a)(2)(A)(iii) as an immigrant who was convicted of an "aggravated felony" and ordered removed in 1998. *Id.*; *see also* ECF No. 2-3 at 9. However, "deportation to Laos was 'not possible' at that time, and on August 10, 2000[,] Mr. Sipaseuth was released from ICE custody and placed on an Order of Supervision." Pet. ¶ 4. Mr. Sipaseuth has complied with his Order of Supervision, and regularly checked in with ICE, for the last twenty-six years. *Id.*

Mr. Sipaseuth is now 53 years old. *Id.* ¶ 6. He runs a small business called Kwik Hourglass in Davis, California and "is the primary breadwinner" for his partner, a lawful permanent resident, and his two U.S. citizen stepchildren. *Id.* He is also "the primary caretaker" for his brother, who is a US-citizen and paraplegic. *Id.*

At some point, Mr. Sipaseuth moved to vacate two of his convictions. *See id.* ¶ 7. On July 1, 2026, the Alameda County Superior Court granted his motion, vacating the convictions, no contest pleas, and sentence as being legally invalid *ab initio*. *Id.* On July 28, 2026, Mr. Sipaseuth retained Otis Landerholm as counsel to file a motion to reopen immigration proceedings and reinstate his permanent resident status. Landerholm Decl. ¶ 5, ECF No. 2-2. The motion was filed on August 12, 2026. ECF No. 16.

Unbeknownst to Mr. Sipaseuth, Laos issued him a travel document on July 2, 2026, that is valid for ninety days. Bartolo Decl., Ex. 1, ECF No. 10-1. On July 15, 2026, ICE revoked his Order of Supervision. *Id.*, Ex. 4. The Notice of Revocation was signed by Jessie D. Gonzalez, a Detention and Deportation Officer in Removal and International Operations, a unit within the Removal Management Division located at ICE Enforcement and Removal Operations headquarters. Obaidy Decl. ¶¶ 6–7, ECF No. 14-1. The Notice of Revocation indicated that Mr. Sipaseuth's Order of Supervision was revoked because ICE had obtained a travel document and scheduled his removal to take place no later than October 2, 2026. Bartolo Decl., Ex. 4.

On July 30, 2026, Mr. Sipaseuth attended a routine check-in with ICE in San Francisco. Pet. ¶ 8. Mr. Sipaseuth was accompanied at the check-in by Mr. Landerholm. Obaidy Decl. ¶ 8. Deportation Officer Zain Tahir conducted an initial interview between approximately 8:30 and 9:00 a.m., with counsel present, and Mr. Landerholm "had several conversations . . . and meetings with . . . [Officer] Tahir" throughout the morning. Landerholm Second Decl. ¶ 1, ECF No. 15-1; Obaidy Decl. ¶ 8. During these conversations, Officer Tahir informed Mr. Sipaseuth that ICE had acquired travel documents for his deportation to Laos and that ICE was going to cancel his order of supervision and place him into custody. Pet. ¶ 8; Landerholm Decl. ¶ 2. "Officer Tahir made it abundantly clear . . . that [Mr. Sipaseuth] would be detained" and told Mr. Landerholm that he might "want to prepare a restraining order or a petition." Landerholm Second Decl. ¶ 2. Mr. Landerholm was never provided with any written materials or shown the Notice of Revocation. *Id.* ¶ 2. Mr. Landerholm left the ICE facility at roughly 12:00 p.m. *See* Obaidy Decl. ¶ 9; Landerholm Second Decl. ¶ 2. Before leaving, Mr. Landerholm wrote down his cellphone number and left it with Officer Tahir. Landerholm Second Decl. ¶ 3.

At approximately 12:55 p.m., without counsel present, Officer Tahir served Mr. Sipaseuth with the Notice of Revocation. Obaidy Decl. ¶ 10. Between approximately 12:55 p.m. and 1:30 p.m., Officer Tahir conducted an informal interview pursuant to 8 C.F.R. §§ 241.4(l), 241.13(i), again without counsel present. *Id.* ¶¶ 11–12, 14. During the informal interview, Mr. Sipaseuth provided a written statement but "did not provide any documents." Bartolo Decl., Ex. 5.

Deportation Officer Habibullah Obaidy, who "assisted with . . . case processing," attests that between approximately 1:15 and 2:00 p.m., he attempted to call Mr. Landerholm five times using his personal and office phone numbers. Obaidy Decl. ¶¶ 12, 14. Mr. Landerholm attests that he received two missed calls on his cellphone from an unmarked number at exactly 1:30 p.m. and 2:01 p.m. Landerholm Second Decl. ¶ 3. Eventually, Officer Obaidy told Mr. Sipaseuth that he was unable to reach Mr. Landerholm. Obaidy Decl. ¶ 12. Mr. Sipaseuth then called Mr. Landerholm and gave his phone to Officer Obaidy. *Id.* ¶ 13. Only then did Officer Obaidy inform Mr. Landerholm that his client had been served with the Notice of Revocation and provided an informal interview pursuant to 8 C.F.R. §§ 241.4(l) and 241.13(i). *Id.*

United States District Court
Northern District of California

Later the same day, Mr. Sipaseuth filed this Petition and sought a TRO enjoining Respondents from detaining him without a pre-deprivation hearing. The Court granted the TRO, issued an order to show cause why a preliminary injunction should not be issued, and set a hearing on the order to show cause for August 13, 2026. *See* TRO Order. Respondents timely filed a response, and Mr. Sipaseuth filed a reply. The Court heard oral argument on August 13, 2026, at which time it indicated that it was inclined to grant a preliminary injunction. *See* ECF No. 17. The Court extended the TRO until August 27, 2026, while the motion remained under submission, and instructed the Parties to file a proposed order by August 19, 2026. *See id.*

## II. LEGAL STANDARD

A party seeking preliminary injunctive relief must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "If a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (citation modified). When the government is the nonmoving party, "the last two *Winter* factors 'merge.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citations omitted).

## III. DISCUSSION

Mr. Sipaseuth makes two legal claims: (1) his re-detention violated 8 C.F.R. §§ 241.4(l), 241.13(i), *see* Mot. at 4–5; and (2) his re-detention violated his procedural due process rights under the Fifth Amendment, *see id.* at 5–7. Respondents argue that the Court lacks subject matter jurisdiction over Petitioner's claims. *See* Opp. at 5–7. Alternatively, Respondents argue that each claim fails. *See id.* at 7–15. Addressing these arguments in turn, the Court finds that it has subject matter jurisdiction and that Mr. Sipaseuth has established at least serious questions going to the merits of both claims as well as an exceptionally strong showing of irreparable harm.

United States District Court
Northern District of California

### A. Subject Matter Jurisdiction

The Court begins with the threshold issue of jurisdiction. 8 U.S.C. § 1252(g) provides that "[n]o court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." Respondents argue that the Court lacks subject matter jurisdiction because Mr. Sipaseuth's claims stem from the Attorney General's decision to execute a removal order against him. *See* Opp. at 5–7; *see also* ECF No. 9 at 5–7. Respondents acknowledge that "[t]his Court . . . has already found that Respondents' 'jurisdictional argument . . . is unpersuasive'" in its TRO Order and submits on their prior briefing. Opp. at 5 (citing TRO Order at 3 n.4).

The Court's view is unchanged. In *Zadvydas v. Davis*, "the Supreme Court explained that habeas petitions [bringing] . . . 'statutory and constitutional challenges to post-removal-period detention' [are] not challenges to the Attorney General's discretion." *Saeteun v. Albarran*, No. 26-CV-04743-CRB, 2026 WL 1454304, at *2 (N.D. Cal. May 22, 2026) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001)); *see also Ibarra-Perez v. United States*, 154 F.4th 989, 997 (9th Cir. 2025) ("[W]e have been clear that § 1252(g) does not prohibit challenges to unlawful practices merely because they are in some fashion connected to removal orders."). Similarly, this Court has jurisdiction over Mr. Sipaseuth's claims because—as other courts in this Circuit have recognized— "Petitioner does not seek relief from this Court from a decision to execute a removal order . . . [and instead] challenges solely the propriety of his detention, not the core proceedings involved in his removal." *Truong v. Noem*, No. 25-cv-2597-JES-MMP, 2025 WL 2988357, at *2 (S.D. Cal. Oct. 22, 2025); *see also, e.g.*, *Venega-Maltez v. Semaia*, No. 26-cv-525-JAK, 2026 WL 846035, at *5 (C.D. Cal. Mar. 24, 2026) (holding, where petitioner challenged detention and sought immediate release, that petitioner was not seeking "relief based on a challenge to the decision to 'commence proceedings,' to the 'adjudicat[ion]' of his case, or the 'execution' of any corresponding removal order. Instead, he challenges his re-detention as one that violated his rights to due process.").

**B. Serious Questions Going to the Merits**

**i. Regulatory Claim**

Turning to the merits of the Petition, Mr. Sipaseuth argues that ICE violated 8 C.F.R. §§ 241.4(l) and 241.13(i) by, among other things, serving the Notice of Revocation and providing the informal interview in "a single, compressed window that began only after [his] counsel had left." Reply at 1, 3–4. Respondents argue that the manner in which Mr. Sipaseuth was served and interviewed complied with the regulations. *See* Opp. at 10–12.

Government agencies, including ICE, must follow their own regulations. *See Alvaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004); *see also Saeteun*, 2026 WL 1454304, at *4 ("[W]here ICE fails to follow its own regulations in revoking release, the detention is unlawful and the petitioner's release must be ordered." (citation omitted)). "When interpreting a [regulation], [courts] look first to its text." *Gonzalez v. Herrera*, 151 F.4th 1076, 1081 (9th Cir. 2025) (citation omitted); *see also Minnick v. Comm'r of Internal Revenue*, 796 F.3d 1156, 1159 (9th Cir. 2015) (per curiam) ("Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction."). However, if the regulation's "terms are ambiguous, [courts] may use canons of construction, legislative history, and the statute's overall purpose" to interpret its meaning. *Id.* (citation omitted).

Here, three canons of construction are germane to the Court's inquiry: the meaningful variation canon, which provides that "different terms usually have different meanings," *Pulsifer v. United States*, 601 U.S. 124, 149 (2024); the harmonious-reading canon, which provides that courts should "interpret [a] statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole," *Rodriguez Vazquez v. Bostock*, --- F.4th ----, 2026 WL 2196424, at *20 (9th Cir. 2026) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)); and the constitutional-avoidance canon, which provides that when "language is susceptible [to] multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems," *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018); *see also generally* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174–183 (2012).

Using these interpretive tools, the Court addresses two related bases for finding that ICE violated the regulations: (a) that the Notice of Revocation was provided only moments before the informal interview; and (b) that ICE did not serve the Notice of Revocation or conduct the informal interview until after Petitioner's counsel left the facility.

a. Opportunity to Respond to the Notice of Revocation

The first issue presented by Petitioner's argument is whether, consistent with 8 C.F.R. §§ 241.4(l) and 241.13(i), ICE can serve a noncitizen with a Notice of Revocation mere moments before conducting the informal interview. *See* Reply at 3. Section 241.13(i) provides that:

> *Upon revocation*, the alien will be notified of the reasons for revocation of his or her release. The Service will conduct an initial informal interview promptly *after his or her return to Service custody* to afford the alien an opportunity to respond to the reasons for revocation stated in the notification. The alien may submit any evidence or information that he or she believes shows there is no significant likelihood he or she [will] be removed in the reasonably foreseeable future, or that he or she has not violated the order of supervision.

8 C.F.R. § 241.13(i)(3) (emphasis added); *see also* 8 C.F.R. § 241.4(l)(1) (containing materially similar language). By using separate terms to describe notice as occurring "[u]pon revocation" and the informal interview as occurring "after . . . return to Service custody," the regulations indicate that the notice and interview are separate events rather than a single occurrence. *See Pulsifer*, 601 U.S. at 149. Thus, ICE cannot notify a noncitizen of the reasons for revocation only moments before conducting the informal interview, and logically so, because this compressed sequence would not afford the noncitizen a meaningful "opportunity to respond to the reasons for revocation stated in the notification," as required by the regulations. 8 C.F.R. §§ 241.4(l)(1), 241.13(i)(3).

This interpretation of the regulations also provides the only harmonious reading of the third sentence in Section 241.13(i)(3), which states that "[t]he alien may submit any evidence or information that he or she believes shows there is no significant likelihood he or she [will] be removed in the reasonably foreseeable future, or that he or she has not violated the order of supervision." *Id.* § 241.13(i)(3). A noncitizen cannot avail himself of the right to submit evidence if the Notice of Revocation, which describes the basis for the adverse decision, is served only

moments before the informal interview occurs. Such an outcome would render the regulatory scheme incoherent, as it would effectively read the third sentence out of Section 241.13(i)(3) and therefore fail to "fit . . . all parts [of the regulation] into an harmonious whole." *Rodriguez Vazquez*, 2026 WL 2196424, at *20 (citation omitted). It would also unnecessarily "raise[] serious constitutional doubts" about the sufficiency of Section 241.13(i)'s intended procedural protections. *Jennings*, 583 U.S. at 286. Thus, ICE cannot serve a noncitizen with notice mere moments before conducting the informal interview consistent with 8 C.F.R. §§ 241.4(l)(1) and 241.13(i)(3). A reasonable opportunity to respond to the reasons for revocation is instead required.

Here, Mr. Sipaseuth has raised at least serious questions regarding whether ICE violated 8 C.F.R. §§ 241.4(l) and 241.13(i) on this basis. Officer Obaidy attests that Mr. Sipaseuth was served with the Notice of Revocation at approximately 12:55 p.m. and that the informal interview was conducted between approximately 12:55 p.m. and 1:30 p.m. *See* Obaidy Decl. ¶¶ 10–11; *see also* Bartolo Decl., Ex. 5 (reflecting that Mr. Sipaseuth provided a written statement but "did not provide any documents"). These facts indicate that Mr. Sipaseuth did not have a meaningful opportunity to submit relevant evidence, such as materials pertaining to the state court's recent decision to vacate two of his criminal sentences, or to otherwise prepare a response to the Notice of Revocation. That is inconsistent with the sequence of events contemplated by the regulations.

b. Deprivation of Counsel

The fact that Mr. Sipaseuth was effectively deprived of his counsel during the informal interview also raises serious questions regarding ICE's compliance with the regulations. In another recent case in this District, counsel for a noncitizen was not informed that the government intended to conduct the noncitizen's interview and, despite requesting to be present, was not permitted to attend the noncitizen's medical screening or to be present thereafter, which resulted in counsel's absence during the informal interview. *See Saeteun*, 2026 WL 1454304, at *5. The court concluded that because "[t]here [was] no dispute that [petitioner's] counsel was prevented from participating in his interview," petitioner was "likely to prevail on his argument that Respondents violated their own regulations as to his re-detention." *Id.*

Like in *Saeteun*, the actions of Officers Tahir and Obaidy had the effect of depriving Mr. Sipaseuth of his counsel, who had accompanied him to the check-in. Mr. Sipaseuth arrived at the ICE facility with Mr. Landerholm, his attorney, at around 8:30 a.m. and Mr. Landerholm remained at the ICE facility until around 12:00 p.m. Landerholm Second Decl. ¶ 1; Obaidy Decl. ¶ 9. Officer Tahir repeatedly spoke with Mr. Landerholm throughout the morning, yet he never mentioned the Notice of Revocation that had been authorized two weeks prior. Landerholm Second Decl. ¶¶ 1–2; *see also Saeteun*, 2026 WL 1454304, at *5. Instead, Officer Tahir told Mr. Landerholm that his client would be detained and suggested that he may wish to prepare a petition for writ of habeas corpus and a TRO. Landerholm Second Decl. ¶ 2. Only after Mr. Landerholm left the ICE facility did Officer Tahir serve Mr. Sipaseuth and conduct the informal interview at 12:55 p.m. Obaidy Decl. ¶ 10–12.

Respondents offer no explanation for the 4.5-hour delay or for why Officer Tahir did not show Mr. Landerholm the Notice of Revocation. Instead, Respondents argue that *Saeteun* is distinguishable because Officer Obaidy "attempted to get in touch with Petitioner's counsel, and after doing so, was informed that Petitioner's counsel was not going to return." Opp. at 8. But Officer Obaidy did not call Mr. Landerholm's cellphone—the contact information that had been provided to Officer Tahir—until 1:30 p.m., *after* the informal interview was already complete. *See* Landerholm Second Decl. ¶ 3. Thus, like in *Saeteun*, the officers' conduct prevented counsel from attending the informal interview. *See* 2026 WL 1454304, at *5. The Court is troubled by this conduct and the lack of explanation for it in the record. Accordingly, the Court concludes that Mr. Sipaseuth has raised at least serious questions regarding whether ICE denied him a procedurally adequate informal interview and opportunity to respond on this basis.

c. Petitioner's Other Arguments Do Not Raise Serious Questions

Mr. Sipaseuth's remaining arguments do not raise serious questions or demonstrate a likelihood of success on the merits. First, Mr. Sipaseuth argues that ICE violated the regulations because Respondents did not provide the Notice of Revocation until two weeks after it was signed. *See* Reply at 1. However, the regulations are silent on the timing between issuance and service of the notice, unlike the following sentence which provides that the informal interview shall occur

"promptly" after the noncitizen is returned to custody. 8 C.F.R. §§ 241.4(l)(1), 241.13(i)(3). Nor is the two-week delay like Petitioner's cited authority, which concerned a Notices of Revocation that was not served until months after the petitioner had been re-detained. *See Truong*, 2025 WL 2988357, at *4. Second, Mr. Sipaseuth argues that the informal interview was inadequate because the officer who signed the Notice of Revocation was not present and neither Officer Tahir nor Officer Obaidy had the authority to rescind the revocation decision. *See* Reply at 2–3. However, Mr. Sipaseuth has not identified any textual basis for this argument in the regulations. Third, Mr. Sipaseuth argues that the record is inconsistent because Respondents did not submit a declaration from Officer Tahir, but did furnish declarations from other officers, and the documents reflect that Mr. Sipaseuth "Refuse[d] to Sign." Reply at 4. Neither of these are inconsistencies, though, in context of the broader record which details the relevant sequence of events.[1]

* * *

In sum, the Court is satisfied that Mr. Sipaseuth has raised at least serious questions regarding whether ICE violated 8 C.F.R. §§ 241.4(l) and 241.13(i) on three bases. Mr. Sipaseuth has therefore carried his burden on his regulatory claim.

**ii. Procedural Due Process Claim**

Mr. Sipaseuth also argues that ICE violated his procedural due process rights by re-detaining him without notice or an opportunity to respond. Pet. ¶ 33; Mot. at 5–7. Respondents argue that the Due Process Clause does not prohibit Mr. Sipaseuth's re-detention because a pre-deprivation hearing is not required by 8 U.S.C. § 1231 and no additional process is owed. Opp. at 12–15. Although the Court has already found in favor of Mr. Sipaseuth on his regulatory claim, the Court reaches the Due Process claim, too, because if meritorious, it will affect the Court's analysis of irreparable harm. The Court begins with whether Mr. Sipaseuth has a protected liberty interest, before addressing what process is required.

[1] In addition, counsel for Petitioner initially argued that Mr. Sipaseuth was not given an informal interview. *See* Mot. at 4 (citing Pet. ¶ 8). However, Respondent submitted evidence showing that Mr. Sipaseuth was interviewed after his counsel left. Mr. Sipaseuth accepts this evidence in his reply brief and thereby concedes the issue. *See* Reply at 1–2.

a. Protected Liberty Interest

To bring a Due Process claim, Mr. Sipaseuth must first establish that he has a constitutionally protected liberty interest. Under the Due Process Clause of the Fifth Amendment to the United States Constitution, no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. Accordingly, the Due Process Clause typically "requires some kind of a hearing before the State deprives a person of [their] liberty," even when it is lawfully revokable. *Zinermon v. Burch*, 494 U.S. 113, 127 (1990); *see also Ortega v. Bonnar*, 415 F. Supp. 3d 963, 969 (N.D. Cal. 2019) ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [the noncitizen] have a liberty interest in remaining out of custody on bond."). Although the initial decision to detain or release an individual may be within the Government's discretion in some circumstances, the decision to release an individual from custody creates "an implicit promise," upon which that individual may rely, that their liberty "will be revoked only if [they] fail[ ] to live up to the . . . conditions [of release]." *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972); *see also Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025) ("[E]ven when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody.").

Applying these principles, the Court concludes that Mr. Sipaseuth has a protected liberty interest in remaining out of custody. On August 10, 2000, the government affirmatively chose to release Mr. Sipaseuth on an Order of Supervision. Pet. ¶ 4. Permitting Mr. Sipaseuth to live in the community for twenty-six years established a significant liberty interest. *See Doe v. Becerra*, 787 F. Supp. 3d 1083, 1093 (E.D. Cal. 2025) (stating the government's actions in allowing petitioner to remain in the community for over five years strengthened petitioner's liberty interest); *Guillermo M. R. v. Kaiser*, 791 F. Supp. 3d 1021, 1029 (N.D. Cal. 2025) ("[I]ndividuals conditionally released from detention have a protected interest in their 'continued liberty." (citation omitted)); *Alva v. Kaiser*, No. 25-cv-06676-RFL, 2025 WL 2419262, at *1, 3–4 (N.D.

Cal. Aug. 21, 2025) (granting preliminary injunction to noncitizen who was subject to a final order of removal but had been released on an Order of Supervision).

In opposition, Respondents argue that the "Supreme Court has made clear that 'there is no plausible construction of the text of § 1231(a)(6) that requires the Government to provide bond hearings before immigration judges after six months of detention.'" Opp. at 12 (quoting *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 581 (2022)). This argument misses the mark. In *Johnson*, the Supreme Court addressed whether Section 1231(a)(6) requires a bond hearing for continued detention, but it expressly declined to address the petitioner's constitutional claims. *See* 596 U.S. at 583. In contrast, Mr. Sipaseuth only brings a constitutional—not a statutory—claim, so *Johnson* is inapposite. *Johnson* is also inapplicable because it concerned "the propriety of a noncitizen's [continued] detention . . . *whose release was properly revoked*," whereas here "[t]he Court's inquiry is into the propriety of revocation of [Mr. Sipaseuth's] release, not the duration of his detention." *Truong*, 2025 WL 2988357, at *5 (distinguishing *Zadvydas*, 533 U.S. at 699, a Supreme Court case that also concerned the length of detention); *see also Johnson*, 596 U.S. at 577 ("His petition challenged his *continued detention* without a bond hearing on both statutory and constitutional grounds." (emphasis added)).

Accordingly, the Court finds that Mr. Sipaseuth has a constitutionally protected liberty interest based on the Government's affirmative decision to release him from detention on an Order of Supervision and let him live in the community for the past twenty-six years.

b. *Mathews* Factors

The Court turns next to whether the process afforded to Mr. Sipaseuth was adequate. In *Mathews v. Eldridge*, the Supreme Court explained that "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." 424 U.S. 319, 332 (1976). The Supreme Court identified three factors relevant to the due process inquiry: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation . . . and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and

administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335. The Court joins others in the Circuit in applying the *Mathews* factors to determine the constitutionally sufficient procedures to protect Petitioner's liberty interest. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022) (recognizing that many courts have applied the *Mathews* test in considering due process challenges in the immigration context); *see also, e.g.*, *Pinchi*, 792 F. Supp. 3d at 1033–36; *Omer G. G. v. Kaiser*, 815 F. Supp. 3d 1098, 1110–11 (E.D. Cal. 2025).

Mr. Sipaseuth has a substantial private interest in his continued freedom, which allows him to live with his family, care for his brother who is paraplegic, and run his small business. *See Morrissey*, 408 U.S. at 482. This interest is not altered even if Mr. Sipaseuth may be lawfully re-detained with adequate process. *See* Opp. at 13. There is also a risk of erroneous deprivation that the additional procedural safeguard of a pre-detention hearing would help protect against. *See Guillermo M. R.*, 791 F. Supp. 3d at 1034 ("The lack of any neutral review creates a heightened risk of deprivation for Petitioner."); *Singh v. Andrews*, 803 F. Supp. 3d 1035, 1047 (E.D. Cal. 2025); *Alva*, 2025 WL 2419262, at *5. Respondents' argument that the regulations afford sufficient process is unpersuasive on the record before the Court because, as discussed above, Petitioner has raised serious questions regarding whether ICE adhered to these regulations. *See* Opp. at 14. Finally, Respondents have a minimal interest in re-detaining Mr. Sipaseuth without a hearing because "custody hearings are routine and impose a 'minimal' cost." *Singh*, 803 F. Supp. 3d at 1048 (citation omitted). Although Respondents have presented evidence that the travel document to Laos expires on October 2, 2026, the record contains no evidence regarding the burden the government would face to obtain a new travel document.

On balance, the Court concludes that the *Mathews* factors weigh in favor of Mr. Sipaseuth. Petitioner has thus shown that there are at least serious questions going to the merits of his Due Process claim.

### C. Likelihood of Irreparable Harm

Mr. Sipaseuth argues that he will suffer irreparable harm if he is detained by ICE because "[t]he unlawful deprivation of physical liberty is the quintessential irreparable harm" and because

detention will prevent him from caring for his brother or "maintain[ing] his business." Mot. at 7. Respondents argue that Mr. Sipaseuth has failed to meet his burden because detention during deportation proceedings is constitutionally valid and the irreparable harm must be to Mr. Sipaseuth, not third parties. Opp. at 15–16.

The Court finds that Mr. Sipaseuth has shown that he is likely to suffer immediate and irreparable harm in the absence of preliminary injunctive relief. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017) (citation omitted). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005). As discussed, if Mr. Sipaseuth is re-detained without a pre-detention hearing before a neutral decisionmaker, the deprivation of liberty that he will face is likely unconstitutional and therefore an irreparable harm. *See Hernandez*, 872 F.3d at 995. Respondents' argument that "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process" is of no moment in this analysis because *Demore*, the cited case, speaks only to the validity of continued detention but not to the procedures required initially detain a noncitizen. Opp. at 15 (quoting *Demore v. Kim*, 538 U.S. 510, 523 (2003)); *see also Truong*, 2025 WL 2988357, at *5.

Additionally, the Ninth Circuit has recognized the "irreparable harms imposed on anyone subject to immigration detention," including "the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Hernandez*, 872 F.3d at 995. Mr. Sipaseuth is "the sole provider and caretaker for his brother, who is a paraplegic." Landerholm Decl. ¶ 3. He helps his brother eat, bathe, and dress. *Id.* Mr. Sipaseuth also owns and operates a small business and "is the primary breadwinner" for his partner and stepchildren. Pet. ¶ 6; Landerholm Decl. ¶ 4. Thus, Mr. Sipaseuth has demonstrated that the consequences of his re-detention would be serious and irreparable.

**D. The Balance of Equities and Public Interest**

Because the Court has only found at this stage that Mr. Sipaseuth has shown serious questions going to the merits, the balance of hardships must tip sharply in his favor for an injunction to issue. *See Weber*, 767 F.3d at 942. Mr. Sipaseuth argues this burden is met because there is strong public interest in protecting against unlawful detention and the government cannot suffer harm from an injunction that ends an unlawful practice. *See* Mot. at 8. Respondents argue that the government "has a compelling interest in the steady enforcement of its immigration laws." Opp. at 16.

The Court finds that the balance of equities tips heavily in Mr. Sipaseuth's favor, and the public interest favors an injunction. "The public has an interest in the orderly and efficient administration of this country's immigration laws, but also has a strong interest 'in upholding procedural protections against unlawful detention.'" *Guillermo M. R.*, 791 F. Supp. 3d at 1038 (citation omitted). "[T]the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M. F. v. Wilkinson*, No. 21-cv-01434-JST, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021) (cleaned up) (quoting *Hernandez*, 872 F.3d at 996); *see also Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). And the government is not "harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).

Here, the potential harm to Mr. Sipaseuth is significant, while the potential harm to Respondents is minimal. As discussed above, without the requested preliminary injunctive relief, detention poses a significant threat to Mr. Sipaseuth's liberty interest and the wellbeing of his family. Respondents risk only a short delay in detaining Mr. Sipaseuth by complying with the required process. "Faced with a choice 'between [minimally costly procedures] and preventable human suffering,' . . . the Court concludes 'that the balance of hardships tips decidedly in petitioner's favor.'" *Singh*, 803 F. Supp. 3d at 1049 (alteration in original) (quoting *Hernandez*, 872 F.3d at 996).

* * *

For the above reasons, all four *Winter* factors favor issuing Mr. Sipaseuth's requested injunctive relief. The parties met and conferred regarding the scope of the appropriate injunctive relief and Petitioner submitted a proposed order reflecting the agreed-upon language. ECF No. 18. The Court acknowledges that Respondents strongly object to issuance of this preliminary injunction and their approval of the terms of the injunction does not waive any of their rights on appeal. The Court adopts the proposed order below, with minimal alterations. Because the proposed order does not prohibit Respondents from executing a final order of removal against Petitioner, the Court need not address Respondents' argument that the Court lacks authority to enjoin ICE from removing Petitioner from the United States. *See* Opp. at 18–19.

**E. Security**

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Ninth Circuit has "recognized that Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (internal quotation marks and citation omitted). "The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* As explained in the TRO Order, ECF No. 11 at 7, because the Court perceives no prejudice to Respondents resulting from the preliminary injunction, the Court finds it appropriate to issue the preliminary injunction without requiring security.

**F. Proper Respondent**

Mr. Sipaseuth originally named several Respondents in this action: Moises Becerra, Field Office Director of Enforcement and Removal Operations, San Francisco Field Office, Immigration and Customs Enforcement; Secretary of the Department of Homeland Security Markwayne Mullin; the U.S. Department of Homeland Security; Attorney General Pamela Bondi; and the Executive Office of Immigration Review. *See* Pet. Respondents argue that they should be dismissed because they are not Mr. Sipaseuth's immediate custodian and, instead, Customs

Enforcement San Francisco Field Officer Director Sergio Albarran should be named as Respondent. *See* Opp. at 20–21; *see also Rumsfeld v. Padilla*, 542 U.S. 426, 434–35 (2004). "Petitioner does not oppose Respondents' request." Reply at 12. Accordingly, the Court will substitute Respondent Albarran and dismiss the other named respondents.

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

(1) Petitioner's motion for a preliminary injunction is GRANTED.

(2) Respondents and their officers, agents, employees, and all persons acting in concert or participation with them are ENJOINED AND RESTRAINED from re-detaining Petitioner unless and until Respondents follow all procedures set forth in 8 C.F.R. §§ 241.4(l), 241.13(i), and any other applicable statutory and regulatory procedures prior to re-detention.

(3) Respondents shall provide notice in advance to Petitioner that the purpose of a scheduled appointment is for the revocation of his Order of Supervision.

(4) Respondents shall not prevent Petitioner from having counsel present at the time Respondents revoke Petitioner's Order of Supervision and provide him with the informal interview as required under 8 C.F.R. §§ 241.4(l), 241.13(i).

(5) Nothing in this Order shall be construed to enjoin or restrict Respondents from detaining Petitioner following compliance with paragraph 2, above, or from executing a final order of removal against Petitioner following such compliance.

(6) Nothing in this Order shall enjoin or restrict Respondents from transferring Petitioner outside of this District after any re-detention as specified above, pursuant to their obligations under the injunction in *Sequen v. Albarran*, 810 F. Supp. 3d 1084 (N.D. Cal. 2025). Such transfer does not affect the Court's jurisdiction over the pending habeas petition as Petitioner was in this District at the time the habeas petition was filed. *See Doe v. Garland*, 109 F.4th 1188 (9th Cir. 2024).

(7) This Order shall remain in effect until further order of the Court.

(8) No security bond is required, as the government provides no evidence of costs it will

United States District Court
Northern District of California

incur due to Petitioner's release.

(9) The clerk of court SHALL remove Respondents Moises Becerra, Markwayne Mullin, U.S. Department of Homeland Security, Pamela Bondi, and Executive Office of Immigration Review from the case caption and recaption the case to name Sergio Albarran, Field Office Director of the San Francisco Immigration and Customs Enforcement Office, as the only Respondent.

Dated: August 26, 2026

BETH LABSON FREEMAN
United States District Judge